107 F.3d 12
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ken WILSON, Plaintiff-Appellee/Cross-Appellant,
v.
J. Don HILL, Defendant-Appellant/Cross-Appellee.
 Nos. 95-5682, 95-5740.
 United States Court of Appeals, Sixth Circuit.
 Feb. 04, 1997.
 
 Before: KEITH, BOGGS, and COLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-Appellant J. Don Hill appeals the decision of the district court that he is not entitled to apply an equitable set-off, based on certain claims he had against the individuals who assigned to Plaintiff-Appellee Ken Wilson an agreement under which Hill made monthly payments for certain property. Hill essentially sought to avoid a judgment rendered against him under the agreement, because the original recipients of the monthly payments owed him money pursuant to other business deals. The agreement was assigned to appellee Wilson, who has raised various defenses to having his right to receive the payments impaired by the obligations of those who assigned him the right. Wilson also cross-appeals the district court's determination that the brothers who assigned him the right to receive Hill's monthly payments were insolvent at the time they made the assignment. We hold that the Tennessee law of equitable set-off does not permit parties to set off a claim against an assignor where the claim came into being after the assignment, and we affirm the decision of the district court that Hill was not entitled to set off such claims. The cross-appeal is only relevant if Hill could maintain the set-off, so we need not reach this issue.
 
 
 2
 * The Winson brothers were involved in a series of transactions with J. Don Hill. One of these transactions involved monthly payments from Hill to the Winson brothers for a portion of "Idol Mines" stock. The right to receive these payments was later assigned to Ken Wilson by the Winson brothers. Hill is now essentially arguing that he does not have to pay Wilson on the assigned agreement because the Winson brothers owe him money for other deals in the past that went sour in one way or another, and the Winsons' debt to him should be equitably set off against his debt to Wilson. Because the exact timing and nature of all the transactions is critical to the application of the Tennessee law of equitable set-off, each transaction is described in chronological order.
 
 
 3
 December 1, 1988: Hill buys P & D Notes from the Winsons
 
 
 4
 In this transaction, Hill bought a series of 15 notes made by P & D Trucking, Inc. and Phil Pressely, payable to the Winson Brothers. One P & D note matured every three months beginning April 19, 1989, and each note was worth $100,000. This transaction also included a guaranty agreement as follows:
 
 
 5
 In the event P & D fails to make a payment under the ... Notes when due, ... (2) Bruce Winson or Charles Winson or both will pay to Assignee (Hill) on demand an amount equal to $1.0 million less all payments theretofore paid to Assignee (Hill) hereunder and under the ... Notes.
 
 
 6
 Joint Appendix at 426.
 
 
 7
 January 25, 1989: Hill Buys Portion of Idol Mines Stock/Land Transfer
 
 
 8
 Hill agreed to buy one-third of the stock of Idol Mines, Inc., in an agreement with the Winson brothers and Elmer Kincaid (apparently another business associate of the Winsons) on January 25, 1989. As part of this deal, Kincaid and the Winsons agreed to convey to Idol Mines a few hundred acres and mineral rights in surrounding counties. The Winsons warranted to Hill that these interests in land were free of all liens and encumbrances. It turned out later that the properties were encumbered with $4,553.83 in unpaid taxes.
 
 
 9
 May 9, 1989: The "Agreement"--Hill Buys More Idol Mines Stock
 
 
 10
 In this transaction, Hill agreed to purchase the remaining stock of Idol Mines from the Winson brothers. Hill agreed to pay the Winsons $5,000 per month for thirty months. He made payments for several months, but stopped in September 1989, after the rights to the payments were assigned to Wilson. Hill repudiated the agreement, and officially refused to make further payments, in December 1989.
 
 
 11
 August 18, 1989: Assignment of the "Agreement" Payments to Wilson
 
 
 12
 On this date, the Winson brothers sold their right to receive the $5,000/month payments from Hill to plaintiff Wilson. The Winson brothers apparently sold the right to these payments at a considerable discount.
 
 
 13
 These transactions, on their face, seem straightforward. However, the Winson brothers became insolvent, and the district court found that the Winsons were, in fact, insolvent when they assigned their payments under the Agreement to Wilson.
 
 
 14
 As mentioned, Hill repudiated further payments (which were then going to Wilson under the assignment) under the Agreement on December 6, 1989. Wilson brought suit to collect these payments (as well as other payments due from Hill to the Winsons on a $200,000 promissory note, also assigned to Wilson by the Winsons at the same time, but not at issue in this appeal) in federal court on the basis of diversity. Wilson then moved for summary judgment, seeking $130,000 owing under the Agreement, and $200,000 owing under the promissory notes, as well as pre-judgment interest. The district court granted summary judgment for the full amount Wilson demanded, and Hill appealed. An earlier panel of this Court affirmed the decision as it related to the assignment of the promissory notes, interest, and Hill's general liability under the Agreement, but remanded the case to the district court to answer the question of whether Hill was entitled to set off his claims against the Winsons. Wilson v. Hill, 958 F.2d 373 (table), No. 91-5890, 1992 WL 52711 (6th Cir. Mar. 19, 1992). On remand, the case was tried before the district court without a jury. The district court concluded that Hill was entitled to set off against the plaintiff only those claims that accrued prior to the assignment of the Agreement, pursuant to Hight v. McCulloch, 263 S.W. 794 (1924). This amounted to only $2,917.97, and Hill has appealed again to us, seeking to benefit by setting off what the Winsons owe him under the P & D notes and the Idol Mines transactions. We are now called upon to decide how the Tennessee doctrine of equitable set-off applies to these facts.
 
 II
 
 15
 We review de novo the legal conclusions of the district court supporting its judgment for the plaintiffs. Tennessee law is controlling in this diversity case. Marrical v. Detroit News, Inc., 805 F.2d 169, 171-72 (6th Cir.1986)
 
 
 16
 The district court decided not to allow Hill to set off the P & D debt because it had not "accrued" when the Winsons assigned the Agreement payments to Wilson. In so doing, the court relied on Hight v. McCulloch, 263 S.W. 794 (1924), which explains set-off in the following manner:
 
 
 17
 Except for a few decisions, largely controlled by statutes, that a maker may set off a claim against the holder, if he acquired it against the payee or the transferor before notice of the transfer, at least if non-negotiable, a set-off or counterclaim against the payee cannot be set up against an assignee, according to the weight of authority, even in a case where otherwise proper, if acquired or accruing after the transfer of the paper; and under some statutes the payee must also have had notice of the acquisition of such claim before he made the transfer, in order to make it a defense to the maker as against an indorsee. Set-offs subsequently acquired, even though arising out of a previous transaction, cannot be set up; but this rule does not apply to equities not constituting set-offs which grow out of the original transaction or subject-matter of the contract between the parties to the note and are not discovered until after the transfer.
 
 
 18
 Hight, 264 S.W. at 798, quoting 8 Corpus Juris 805 (emphasis added).
 
 
 19
 Since the P & D notes were being paid on time as of the date of the assignment, Hill had no claim against the Winsons that could be set off against Wilson. Hill, however, is convinced that the insolvency of the Wilson brothers makes this a special case--one in which the usual requirements for set-off are waived. Hill relies on Nolan Bros. Lumber Co. v. Dudley Lumber Co, 156 S.W. 465 (1913), for the proposition that set-off is allowed against an assignee, even where the debt to be set off has not "matured," if the assignor is insolvent at the point the assignment is made. There can be no doubt that Nolan stands for this proposition, and that it removes this case somewhat from the ambit of Hight. Nolan cites the same statutes and much of the same case law cited in Hight (compare, e.g., 156 S.W. at 467 with 263 S.W. at 797-98). The Hight court was clearly aware of Nolan, and quoted approvingly from it. Hight, 150 Tenn. at 132. It would thus seem beyond dispute that Hight applies generally, but did not overrule the special insolvency rule in Nolan.
 
 
 20
 The district court gave as its basis for refusing to apply Nolan the following:
 
 
 21
 In Nolan Bros., the defendant was permitted to set off the amount previously paid as an endorser on behalf of the assignor on a defaulted note against amounts he owed the insolvent assignor in the hands of an assignee bank. It is significant that the defendant in Nolan Bros., had actually paid out monies on behalf of the assignor, as its endorser or surety. In the present case, Mr. Hill has not paid out money on behalf of the Winsons.
 
 
 22
 JA at 37. Finding no specific language in Nolan to limit it to situations where the defendant has paid money on behalf of the assignor (as opposed, for example, to failed to receive money due from the assignor), nor any indication that the Tennessee Supreme Court would so limit this case, we decline to endorse the district court's reasoning in this area. Nonetheless, the district court reached the correct result, ruling that Hill could not set off the P & D note sums.
 
 
 23
 Although Nolan obviates any concern that the P & D debt had not matured, it does not excuse Hill from proving the mutuality of the debts. Tennessee courts inquire into the mutuality of the debts to determine whether, in a sense, the debts "cancel" perfectly, or whether set-off would amount to canceling "apples" with "oranges," in a manner inconsistent with the purpose of balancing equities. The mutuality necessary for set-off includes both mutual parties and mutuality of debts. Hooper v. Spicer, 32 Tenn. (2 Swan) 494 (1852). Mutuality of parties is satisfied here because the debts in question were mutual between Hill and the Winson brothers (except for the debts relating to the Idol Mine deal which were tainted by the involvement of a third party, Elmer Kincaid, as discussed briefly, below).
 
 
 24
 The mutuality of the debts themselves is where Hill's case falls apart. The analysis of this question requires the court to compare Hill's promise to pay $5,000 per month for 30 months, against the Winson brothers' promise to pay an indeterminate amount to make good on the P & D notes if P & D defaulted. The district court concluded that there was no mutuality here because the Winson's obligations were not "of a sum certain" and were not "fixed" at the point of assignment. Memorandum Opinion at 11. The district court cited Bramham v. Lanier Bros., 138 Tenn. 702, 705 (1917), for the proposition that obligations must meet these requirements of being certain and fixed to be mutual for purposes of set-off. Hill's argument focused almost exclusively on the district court's favorable treatment of Hight and unfavorable treatment of Nolan. Only in his reply brief does Hill address the lack of mutuality of his asserted set-off. There, Hill argues that, although mutuality (presumably including the concerns that a debt be "fixed" and "of a sum certain") is a requirement for set-off, "[i]t [mutuality] need only exist at the time of trial." Appellant's Reply Brief at 15. For support, Hill relies on Brazelton v. Brooks, 39 Tenn. (2 Head) 193 (1858), and Keith v. Smith, 31 Tenn. (1 Swan) 91 (1831). These cases, however, only relate to set-off directly between one plaintiff and one defendant based upon debts that come into being before trial between the two. They do not speak to the situation where a third party is involved, and where the legal question posed is "when do the claims against an assignor have to be fixed in order to be asserted against an assignee ?" The answer, it seems clear, is "before the assignment."
 
 
 25
 Indeed, a treatise points out that "[t]he uniform rule is that the maker of a negotiable instrument cannot plead a set-off or counterclaim which arose out of an independent transaction and subsequent to the transfer from the payee, though the holder is not one in due course." Set-off of Counterclaim between Prior Parties to a Negotiable Instrument as Available Against One Not a Holder in Due Course, 70 A.L.R. 245, 258 (1931). In addition, "[a]ll of the courts restrict such pleas either to matters arising out of the same transaction as the instrument sued on, or to matters existing at the time of the maker's knowledge of the transfer." Ibid.
 
 
 26
 The policy basis for this rule seems equally clear: if the rights of assignment holders were at risk for the liabilities of assignors that develop after assignment, such assigned rights would be practically worthless. No investor would give value in exchange for such assigned rights if the rights could be impaired or negated by subsequent actions of the assignor. Nor would any amount of good faith or diligence on the part of a purchaser help avoid this problem. Even the authority relied upon by Hill supports this view. Hill includes the following quote from Professor Williston, set out in 3 Williston, on Contracts (3d ed.) § 432, at 189:
 
 
 27
 The denial of a right of set-off because either the assigned claim or the cross-claim was not due at the time of the assignment is, however, not consistent with the general principle allowing set-off against the assignee of claims due from the assignor; and there is good authority to support the rule that the only questions should be: (1) did the claim against the assignor exist whether matured or not, before notice of the assignment, and (2) were both claims matured when set-off was asserted?
 
 
 28
 Thus, at minimum, the claim must exist before assignment (or possibly notice of assignment) in order to form the basis of a set-off.
 
 
 29
 Hill seems to conflate the concepts of maturity and the fixed nature of a debt. His claim against the Winson brothers was not simply immature at the point of the assignment, so as to benefit from the special Nolan insolvency/maturity rule. Rather, his claim against the Winson brothers simply did not exist at that point. In the case of an assignee who takes certain rights from an insolvent entity, knowing (or able to know, perhaps) that certain debts exist and will come due with time (mature) and otherwise cancel the right he or she is purchasing if it stayed in the hands of the seller, it makes sense that the assignee might have to make good on the other debts via set-off. In such instances, a purchaser should know that he is prejudicing the rights of another by taking value that is owed to the other, but most likely will not be paid due to insolvency.
 
 
 30
 Such is not the case when a debt requires more than the mere passage of time to mature, but rather completely comes into existence after an assignment. The district court specifically noted that at the point of the assignment, the P & D notes debt was still contingent upon the failure of P & D to continue making the payments.
 
 
 31
 We are thus confident that the Nolan decision does not help Hill in overcoming the fact that the set-off claim arose only after the assignment. The district court thus correctly refused to let Hill set off the money owing under the P & D notes agreement.
 
 III
 
 32
 Hill also argues that he should have been allowed to set off about $5,000 that he had to pay because his purchase of Idol Mines included various parcels of land encumbered by taxes, even though the Winsons and Elmer Kincaid covenanted that the lands they were to transfer to Idol Mines were free of all liens and encumbrances. As discussed above, the district court correctly concluded that this "debt" failed the first part of mutuality analysis (mutuality of parties) because it involved Elmer Kincaid, and was a debt owed to Idol Mines, the corporation, not to Hill personally. On appeal, Hill only argues that there are situations in which a corporation's shareholders can sue in their individual capacity, and that this was one of them, making the debt mutual. Regardless of the merits of this response, Hill fails to address the destruction of mutuality because of Elmer Kincaid's involvement. This alone is sufficient to affirm the district court on this relatively minor point.
 
 IV
 
 33
 For the foregoing reasons, the decision of the district court is AFFIRMED.